VEAZIE (WADLEIGH v.). See Case No. 17,-031.

---

## Case No. 16,906.

### VEAZIE v. WILLIAMS.

[3 Story, 54.] [1]

Circuit Court, D. Maine. Oct. Term, 1843.

PLEADINGS AND PROOF—EQUITY PROCEDURE—RELEASE—HOW AVAILED OF.

Where the bill alleged. that the plaintiff was purchaser of certain mill privileges from the defendant. which were sold at auction by H. as agent of the defendant, and that by-bidders were fraudulently employed, who greatly enhanced the price by false bids, and the defendant insisted in argument, that a release of all liability in the premises. given by the plaintiff to H., his agent. but which was not referred to in the bill, and was not set up in the answer as a bar or defence, was a release, by relation, of the defendant as principal—it was *held*. that the question as to the legal operation of the release did not properly arise upon the bill and answer, as it stood, and that to raise the question, a supplemental bill, with proper averments, as to the release, should be filed. to enable the defendant to make full answer.

Bill in equity. The bill sets forth in substance, that on the first day of January, 1836, Nathaniel L. Williams of Boston, and Stephen Williams of Roxbury, in the state of Massachusetts, merchants, were the owners of two certain mill privileges, situated on Old Town Falls, in the town of Orono. in said state of Maine. And the said Nathaniel and Stephen, at the Penobscot Exchange, in said Bangor,. on said first day of. January, offered the said two mill privileges for sale, at public auction, to the highest bidder, and then employed one Henry A. Head, to act in their behalf as auctioneer, and instructed the said Head, by themselves, or their agent, to put the said two privileges up for sale, beginning with the sum of $14,500, for the lowest bid or minimum price. And the said Nathaniel and Stephen, did further announce and prescribe as the conditions of sale, ten per cent. of the purchase money to be paid down. twenty per cent. more when the deed should be given, and the remainder in equal payments of one and two years. And the plaintiff [Samuel Veazie] complaining, says, that relying upon the good faith of the said Nathaniel and Stephen in the premises, and in the good faith and honest and fair dealing of the said Head, in making the said sale, did attend the said sale, and did bid at the auction in and by one Samuel J. Foster, his agent. And the sum of $14,500, the minimum price, having been bid for said two mill privileges, the said Head continued to announce that a still higher sum was offered by some other bidder, and the said Foster supposing that a higher bid had, in fact, been made, did make a still higher bid,

---

1 [Reported by William W. Story, Esq.]

and the said Head pretending he had received a still higher offer from some other bidder at said auction, the said Foster offered a still higher sum, until at length the same privileges were stricken off to said Foster for the plaintiff, for the sum of forty thousand dollars, and the plaintiff then supposing the bidding aforesaid had been actually made in good faith, paid down the sum of four thousand dollars, being the ten per cent. of the purchase money, and the further sum of eight thousand dollars on the delivery of the deed, and gave his promissory note for the further sum of fourteen thousand dollars, payable in one year, with interest, which note the plaintiff has since paid, and also gave his further note of fourteen thousand dollars, payable in two years, with interest, on which last note he has paid the interest up to Jan. 1, A. D. 1840. And the said Nathaniel and Stephen, thereupon made and executed a good and sufficient deed of said two mill privileges to the plaintiff, for the consideration aforesaid of forty thousand dollars, so paid and secured to be paid. And the plaintiff, at the same time, made and executed to said Nathaniel and Stephen, a deed of mortgage of said two privileges, as collateral security for the payment of said two notes of fourteen thousand dollars each, and one other note for nineteen hundred dollars, part of the eight thousand dollars aforesaid. And the plaintiff further alleges and says, that there was, in fact, no real bid at said auction and sale aforesaid for a larger sum than sixteen or eighteen thousand dollars, by or for any real purchaser or person, there intending to purchase; but that said Head, by sham and pretended bids as for some person unknown to the plaintiff, run up the said Foster, by successive pretended bids of one hundred dollars at a time above the bids of said Foster, from the said sum of sixteen thousand dollars, or some such amount, to the enormous amount of forty thousand dollars; whereas the plaintiff charges and says, that in truth there was no real bid by any person intending to purchase, or in behalf of any bona fide intended purchaser whatever, of a greater sum than sixteen thousand dollars as aforesaid, excepting only the bids of said Foster, in behalf of the plaintiff. And the said Nathaniel and Stephen, by reason of the aforesaid management, and proceeding of said auctioneer in the employment of said Nathaniel and Stephen, and by means of his sham and pretended bids at said sale, have received of and from the plaintiff a large sum of money, to wit: the sum of eighteen thousand dollars and upwards, which in equity and good conscience, they ought not to have received, and the plaintiff has been greatly deceived and defrauded. And although the plaintiff having, since the first day of January, A. D. 1840, first discovered the fraud practised upon him, and having thereupon notified the said Nathaniel and Stephen, of the wrongful doings and proceedings of the said Head in the premises, had well hoped that the said Nathaniel and Stephen would not

have attempted to take advantage thereof, but would have cancelled the deeds aforesaid, and refunded the money so wrongfully obtained of the plaintiff; yet the said Nathaniel and Stephen, not only have refused to cancel and rescind the deeds aforesaid, and to repay to the plaintiff the purchase money or any parts thereof so received by said Nathaniel and Stephen wrongfully and unjustly; but have sued out of the clerk's office of the circuit court for the First circuit, a writ of attachment, returnable to the circuit court, then next to be held at Portland, within and for the Maine district, on the first day of May last past, and caused the goods and estates of the plaintiff to be attached, and him to be served with notice according to law, which said suit was duly entered when and where said writ was returnable, and is now pending before said court as a court of law, in which said suit the said Nathaniel and Stephen have declared upon said last mentioned note of fourteen thousand dollars, and are seeking to prosecute the same to final judgment and execution, and thereby to enforce payment of the note aforesaid from the plaintiff. All which actings and doings of the said Nathaniel and Stephen are contrary to equity and good conscience, and tend to the manifest wrong and injury of the plaintiff in the premises. The bill prays, that the said Nathaniel L. Williams and Stephen Williams, may be enjoined from further prosecuting their said suit at law against the plaintiff, brought for the recovery of the amount of said note, and that they may be ordered to deliver up said note to the plaintiff, and that the sale aforesaid may be rescinded and annulled, and that the said Nathaniel and Stephen may be ordered to pay back to the plaintiff all such sums as they have received by reason of the premises from the plaintiff, with all due damages and interest, and for further relief.

The defendants, Nathaniel L. Williams and Stephen Williams, in their answer admit, that they were owners of the said mill privilege, at Old Town Falls, as set forth in the bill, and that, believing that from their local situation, they would command a ready sale at a large price, they employed one J. Bright, who resided at the city of Bangor, not far distant from the said property, to advertise the same for sale at public auction, on the said first day of January, eighteen hundred and thirty-six. That a few days before the said day when the said sale was advertised to take place, the respondents not being able to go to Bangor and make the necessary arrangements for the sale, employed and deputed one Stephen H. Williams, the son of the said respondent, Stephen Williams, to go to Bangor, and employ an auctioneer, and make all necessary arrangements for the sale. But the respondents deny that then or at any other time, they instructed the said Stephen H. Williams or the said Bright, or any other person, or in any way intimated or suggested to them, or either of them, or to any other person, that there should

be any by-bidding, or any fictitious bid at the said auction sale, or any other practice whatsoever at the said auction sale, inconsistent with entire fairness and good faith, or that at any time before the said sale took place, the said Stephen H. Williams or the said Bright, or the auctioneer employed, as hereinafter mentioned, or any other person whomsoever, received from these respondents, or either of them, to the knowledge or belief of either of them, any authority, instruction, intimation, or suggestion, to run the said property up by fictitious bids, at the said auction, or to do, or cause to be done, any thing fraudulent or unfair, or inconsistent with entire and perfect good faith.

The respondents admit, that they did affix a minimum price, of fourteen thousand five hundred dollars, to the said property, as is stated in the said bill, intending to protect the same from being sacrificed and sold for much less than its true value, but aver that they did not instruct their agent, or any other person, to keep the same secret, and though they have no personal knowledge thereof, yet they believe and admit, that it was well known at the said auction sale, that such minimum price had been prescribed and fixed by the vendors of said property; but they are informed and believe it to be true, that no bid was made at the said sale by any agent of the respondents, in consequence of the fixing of the said minimum price; bids far exceeding that amount being immediately made by those desiring and intending to purchase, so that no agent of the respondents had any occasion to bid thereon, to prevent the same from being sold for less than the said minimum price. And the respondents further admit, that the other conditions of sale were, ten per cent. of the purchase money to be paid down, twenty per cent. more when the deed should be delivered, and the remainder was to be paid in two equal instalments, at the end of one and two years from the sale. That they are informed, and believe it to be true, that the said Stephen H. Williams, being empowered and commissioned by the respondents as aforesaid, proceeded to Bangor aforesaid, and having made inquiry after a suitable auctioneer, was recommended to employ one Henry A. Head, a person who was said to be duly licensed and empowered to act in that capacity, under the laws of the state of Maine, and to be a skilful man, and much employed in the sale of lands; and thereupon the said Stephen H. Williams, supposing and believing him to be an honest man and a good auctioneer, did employ him to act as auctioneer in making sale of the said property at the said auction. And the respondents are informed and verily believe it to be true, that the said Stephen H. Williams did not authorize or request the said Head or make any suggestion or intimation to him, that he the said Head should or might pretend, that he had received any bid, which he did not in fact receive, or should or might do any act or thing which would be contrary to the most perfect good faith, or in

any way inconsistent with the just rights of bidders or purchasers, at an open and fair auction sale; but on the contrary thereof, the respondents are informed, and verily believe, and do aver, that the said Head was employed by the said Stephen H. Williams, as a public officer empowered by the laws of Maine to make auction sales, and with the full belief that the same would be conducted by him in all respects as his duty as such public officer required; and they are further informed and believe it to be true, that the said Head was not authorized or requested by the said Stephen H. Williams, or in any way empowered to bid up to the said minimum price for the said property, or to make any bid whatsoever thereon, on account of your respondents. And the respondents further say, that they were not present at the said sale, and have no personal knowledge thereof; but to the best and utmost of the knowledge and belief of each of them respectively, they deny, that there was no real bid at the said auction sale for a larger sum than sixteen or eighteen thousand dollars, or any such sum, by or for any real purchaser or person there intending to purchase; or that the said Head, by sham and pretended bids, run up the said Foster (in the said bill mentioned as the agent of the said complainant) by successive pretended bids of one hundred dollars at a time, above the bids by the said Foster, from the sum of sixteen thousand dollars, or any such amount, to the sum of forty thousand dollars; or that in truth there was no real bid by any person intending to purchase in behalf of any intended bona fide purchaser of a greater sum than sixteen thousand dollars, or any such sum. That after the said sale had taken place, the said Veazie did represent to the respondents, that the said Foster had acted as his agent in bidding off the said property at the said auction, and exhibited very great anxiety to have the conveyance of the said property made; and the respondents are informed, and believe it to be true, that there was at the time of the said sale, a great competition for the purchase of the said property, not only on account of its own intrinsic value, but also on account of its local position in respect to other property belonging to different persons; and that the said Veazie, before the said sale, authorized the said Foster to bid as high as forty thousand dollars for his account; and that the said Veazie, immediately after the said sale, manifested great eagerness to have the bargain closed, and much anxiety lest the respondents should be induced by an offer of a larger sum than forty thousand dollars by some other person, to refuse to complete the same. But the respondents, acting in entire good faith, and without any fraud, concealment, or misrepresentation, proceeded to execute the contract aforesaid, and did execute and deliver to the said Veazie, a good and sufficient deed of the said property, and received from the said Veazie the money payments in the said conditions of sale mentioned, and a further portion of the purchase money, amount-

ing to the sum of two thousand dollars, which the said Veazie voluntarily paid in cash, and the notes of the said Veazie, payable in one and two years respectively, for the residue of the said purchase money, secured by a mortgage upon the said property; and the said Veazie having paid one of the said notes, the respondents were content to allow the other to remain unpaid, though at maturity, the said Veazie continuing to pay annual interest on the same up to the first day of January, eighteen hundred and forty, when he made the last payment; though the said Veazie never gave to your respondents, nor to either of them, to the knowledge or belief of either of them, any information or notice, that he deemed the said sale invalid, for any reason, or would not pay the said remaining note, until on or about the fourteenth day of January, A. D. eighteen hundred and forty-one; and the respondents then caused a suit to be instituted on the said note, which is the same suit mentioned in the said bill of complaint.

And the respondents, further answering, say, that since the said sale was made, and before the filing of the said bill, more than five years and six months had elapsed. That, in the mean time, not only have your respondents lost the benefit of much evidence, which they verily believe they might have obtained, as to the occurrences at the said sale, but there has been a very great change and depreciation in the value of real property, of all kinds, in that part of the said district of Maine, where the said property is situated, and in an especial manner has there been such change and depreciation in the value of the said property, sold to the said Veazie, as aforesaid. That owing to a large increase in the number of mills in that vicinity, the growing scarcity of timber, and the concentration of timber lands into a few hands, together with the financial difficulties by which the country has been oppressed, mill seats, on that part of the Penobscot river, and especially those in question, have been greatly depreciated in value, and are now intrinsically worth very much less than when the said sale was made; and these respondents are informed and believe, that changes have been made in the said property, by building on, and otherwise altering the same.

The respondents are not informed at what time, in particular, the said Veazie pretends to have first discovered the pretended fraud in the said bill, alleged to have been practiced at the said sale, but the respondents verily believe, that whatsoever was done at the said sale, material to the interests or right of the said Veazie, might have been known to him at any time, if the same were not actually known to him, as to which the respondents have no knowledge or information, and they pray that proof of due diligence may be required of the said Veazie. The respondents verily believe, that since the changes aforesaid have taken place in the condition and value of the said property, the said Veazie would glad-ly annul the said bargain, and have the said property restored to your respondents, in its altered and depreciated state, and compel your respondents to repay to him so much of the price thereof as he has paid to them, and so much money as he has seen fit, for his own purposes, and pursuant to his own views and plans, to expend on the said property; but your respondents pray the judgment of this honorable court, whether, after the lapse of so much time, and after such great changes have taken place in the condition and value of the said property, this honorable court will set aside the said contract, more especially as the said respondents deny, to the best and utmost of their knowledge, information and belief, that the alleged fraud, stated and charged in the said bill, was in fact practised, or that the respondents, or either of them, to the knowledge or belief of the other of them, have or has ever concealed from the said Veazie, or attempted to conceal from him, or used any means whatsoever to conceal from him any matter or thing, done, said, or transacted at the said sale, or having any connection therewith; and the respondents further say, that they are informed, and believe it to be true, that, previous to the said sale being made, the said Head made some inquiries of the said Stephen H. Williams, the agent of your complainants, as to his compensation, to which the said Stephen H. Williams answered, he would pay him what was customary, and this was the only contract, agreement, or understanding with the said Head, in regard to his compensation. That just before the said sale began, the said Head said in a laughing way, that he should be willing to take for his services, what the property should bring over the said minimum price; but the said Stephen H. Williams understanding the remark as not seriously intended, made no reply; and these respondents verily believe that said remark was meant as a jest, for they are informed, and believe it to be true, that the said Head never after recurred to it. And the respondents are informed, and believe it to be true, that the said Stephen H. Williams paid to the said Head, the sum of two hundred dollars as a compensation for his services as auctioneer in selling the said property; that the said payment was made after the said sale had been effected, and the sum paid was deemed reasonable by the said Stephen H. Williams, and was not disapproved by these respondents, when the same came to their knowledge, and that there was no contract, agreement, or understanding, to the knowledge or belief of the respondents, that the said Head was to receive nothing for his services, if no sale were effected, nor any other contract, agreement, or understanding than the one above mentioned.

The following agreement of facts also appeared in the case: "In the above entitled cause, it is agreed, that before the said bill was filed by the complainant against the defendants, the counsel of the complainant call-

ed on the witness, Head, who has been examined in this cause, and requested the said Head to state to him the facts and circumstances of the sale at auction, which is the subject of this suit, and upon a suggestion by the said Head, that it might involve him in some pecuniary responsibility, the counsel of the complainant assured the said Head, that the complainant would give him a release of all claims on his part. That afterwards, and before the said bill was filed, the said Head was summoned to give a deposition in perpetuam, before two magistrates, at Bangor, in the said district; and the complainant and his counsel, and also a gentleman of the bar, who appeared in behalf of the said respondents, being present, the release, a true copy whereof is hereto annexed, and which may be used instead of the original, was drawn by one of the said magistrates, and executed and delivered to the said Head, by the said complainant. That the gentleman who then and there acted as counsel for the said respondents, has not acted for them in this suit in equity,—Messrs. Curtis, of Boston, and Mr. Charles S. Daveis, of Portland, having conducted the defence of this suit,—and neither they nor the respondents, had any knowledge of this release, until after the publication of the evidence in this suit, when finding an allusion to it in the testimony of the said Head, they took measures to, and did procure a copy thereof. And it is further agreed, that the said release, and the above facts and circumstances may be referred to, and made use of in this cause, with the same effect as if the same had been put in issue by a cross bill, and admitted by the answer, and this agreement is to be made a part of the said case, and to be filed therein. Know all men by these presents, that I, Samuel Veazie, of Bangor, in the county of Penobscot and state of Maine, Esquire, in consideration of one dollar to me paid by Henry H. Head and Nehemiah O. Pillsbury, both of said Bangor, auctioneers, and late co-partners in the auction business, under the firm and style of Head & Pillsbury, the receipt whereof I do hereby acknowledge, do hereby release and discharge said Head & Pillsbury, jointly and severally, from all damages by me sustained, or supposed to be sustained, and from all action, or causes of actions, to me accrued, or accruing, in consequence of any misfeasance, non-feasance, or malfeasance, or any illegal management, by them done, performed, or suffered, at the sale at auction of Nathaniel L. Williams and Stephen Williams' real estate, situated in Old Town, in said county of Penobscot, on or near Old Town Falls, so called, which was sold at auction, in or near January 1st, 1835, by the said Head & Pillsbury, as auctioneers, hereby also releasing the said Head & Pillsbury from any claim for damage, by or in consequence of any of their proceedings, relating to said sale of said property. In witness whereof, I have hereto set my hand and seal, this twenty-first day of July, A. D. 1841. Samuel Veazie."

Mr. Rogers, for plaintiff.

B. R. Curtis (with whom was C. P. Curtis), for defendants.

B. R. Curtis, for defendants, contended, as a preliminary point, decisive of the whole cause, that the release to Head, the auctioneer, connected with the agreement of the parties, amounted to a virtual extinguishment of all right of action against the defendants, since a discharge of Head from all responsibility was a discharge of his principals also, who were only liable for his torts by relation; and if they were compellable to pay damages to the plaintiff, or the relief sought by the bill was obtained, they would have an action over against Head, so that it would defeat the indemnity intended by the release.

Mr. Rogers insisted, that this was contrary to the intent of the parties in the release, which was to discharge Head, personally, from all liability, but to retain the entire right against the defendants, in the same manner as if the release had not been given.

STORY, Circuit Justice. In my judgment, there are intrinsic difficulties in proceeding further in this case, upon this point, in the present posture of the record. The release is not referred to in the bill; nor any attempt there made by any allegation to show, that its general terms are not to be understood, in their fullest sense, as a complete release and a full indemnity to Head. Neither is the release set up as a defence or bar in the answer, so as to put it in issue, much less, so as to enable the court to say, that it ought not to be interpreted in the most ample manner in favor of Head, and consequently in favor of the defendants. The agreement indeed does bring it before the court, but incidentally, and not directly as a matter in issue. And indeed, upon the language of the agreement, nothing more would seem to be put in issue than the mere fact of its existence. It is plain, therefore, that the plaintiff cannot avail himself, in this state of the proceedings, of the point, on which he relies, viz. that the release was not intended to relieve the defendants, but only to relieve Head from personal responsibility; and that, notwithstanding the terms of the release, upon its actual intent, as understood by the parties at the time, the defendants were not discharged truly. What may be the actual operation of the release in the present case, as to the defendants, I do not presume now to decide. But certainly the question, whether it is not a virtual discharge of the defendants by operation of law, is a question of grave importance, and of no inconsiderable difficulty. At least, I can only say, that I feel that there is great weight in the argument of the defendants' counsel on this point.

To bring the whole question properly before the court, in a manner, which will enable us to understand and thoroughly to sift

it, it seems to me that it will be necessary for the plaintiff to file a supplemental bill to bring the release directly before the court, with suitable averments as to its object and intent, so that the defendants may put in a full answer thereto, and proofs on the point may be introduced on both sides. In the mean time, and until the supplemental proceedings are had, it will be right to suspend the further hearing of the cause.

Upon this instruction of the court, Mr. Rogers for the plaintiff, (with whom was Mr. Preble,) moved for leave to file a supplemental bill, and that in the mean time the further hearing of the case be suspended. [See Case No. 16,907.]